# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 5863 | **DATE** | 3/20/2002 |
| **CASE TITLE** | PATSY CARUGATI vs. THE LONG TERM DISABILITY PLAN FOR SALARIED EMPLOYEES | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Plaintiff's motion for summary judgment [23-1] is granted. Defendant's motion for summary judgment [27-1] is denied. ENTER MEMORANDUM OPINION AND ORDER.

*Suzanne B. Conlon*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | MAR 21 2002 date docketed | |
| | Docketing to mail notices. | | | 38 |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 3/20/2002 | |
| | | 02 MAR 20 AM 9:00 | date mailed notice | |
| CB | courtroom deputy's initials | Date/time received in central Clerk's Office | CB mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



PATSY CARUGATI )
)
Plaintiff, ) No. 01 C 5863
)
v. ) Suzanne B. Conlon, Judge
)
THE LONG TERM DISABILITY PLAN )
FOR SALARIED EMPLOYEES )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

Patsy Carugati sues The Long Term Disability Plan for Salaried Employees ("the plan") for violation of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), in the termination of her disability benefits. Carugati and the plan cross-move for summary judgment.

## BACKGROUND

All facts are undisputed unless otherwise noted. Carugati, a 56 year old female, is a participant in an ERISA employee welfare benefit plan ("the Hartford plan"). The Hartford plan was established by Carugati's former employer, Van den Bergh Foods Co. ("Van den Bergh"), through the purchase of group insurance issued by Hartford Life and Accident Insurance Co. ("Hartford").

On October 18, 1976, Carugati was hired by Van den Berg as an office clerk and receptionist. On February 20, 1999, Carugati left her employment because she suffered from fibromyalgia and chronic fatigue syndrome. As part of her employee benefits package, Carugati was insured for long-term disability benefits. Under the Hartford plan, long-term disability benefits are payable to eligible

1

participants in accordance with the plan's terms, conditions, limitations, and exclusions. According to the Hartford plan, "total disability" is defined as:

(a) during the elimination period; and
(b) for the next 24 months;
> you are prevented by Disability from doing all the material and substantial duties of your own occupation on a full-time basis. After that, and for as long as your remain Totally Disabled, you are prevented by Disability from doing any occupation or work for which you are or could become qualified by training, education, or experience.

Def. 56.1 Facts at ¶ 8. The Hartford plan allows termination of benefits on the date the plan participant is no longer disabled. Carugati received long-term disability benefits from August 1991 to October 2000 in the amount of $350 per month. In 1991, Dr. Morris Papernik, Carugati's treating physician diagnosed Carugati with fibromyalgia and chronic fatigue syndrome. Dr. Papernik concluded: "Due to her fatigue and memory/concentration loss, she is unable to work in an environment where either physical or mental aptitude is required." *Id.* at ¶ 13. Hartford conducted two independent evaluations on Carugati in 1992, one evaluation in 1993, and a functional capacity evaluation in 1994. In April 1992, Dr. Natu Patel reported: "[a]ccording to her complaints, she may not be able to do her job at present, but physical exam does not support her present severity of problem." *Id.* at ¶ 15. On July 21, 1994, Carugati underwent a work capacity evaluation. The evaluation concluded: "[a]s evidenced by the specific tests mentioned where maximal effort was not exerted and by refusal to complete functional capacity checklist; Mrs. Carugati is not motivated to exhibit accurate physical capacity." *Id.* at ¶ 17. The evaluation stated Carugati could not return to work at that time, and the date she could be employed was undetermined because she exerted "less than maximal effort" during the evaluation. *Id.* at ¶ 19. The report also stated: "The patient made the following statements. 'I don't want to answer the questions because it might affect my insurance

... These questions are inappropriate [sic] for people with chronic fatigue[.]" *Id.* at ¶ 18. In May 1995, Carugati underwent a neuropsychological evaluation that concluded Carugati "appears to have settled into a pattern of invalidism" and has "little motivation to enter into a rehabilitative program that would result in her return to work, even if on a limited basis." *Id.* at ¶ 22. In claims questionnaires completed by Carugati in 1998 and 2000, Carugati stated she had difficulty getting dressed, concentration and balance problems, dizziness, and difficulty walking. She stated her "whole day is spent resting and sleeping." *Id.* at ¶ 23. From October 1991 to June 2000, Dr. Papernik concluded Carugati was disabled due to chronic fatigue syndrome and fibromyalgia in several evaluations.

The plan hired Con Data Consultants, Inc. to undertake video surveillance of Carugati in March and April 2000. On March 31, 2000, Carugati was observed walking her dog for 14 minutes. Carugati carried and climbed a small step ladder, reached above her head, and removed an air conditioner cover. Carugati was observed walking her dog for 11 minutes on April 1, 2000 and 9 minutes on May 8, 2000. No further outdoor activity was recorded by the surveillance team over the course of several days. On June 20, 2000, a Hartford field representative interviewed Carugati. At the interview, Carugati stated she continued to receive treatment from Dr. Papernik, and she suffered from extreme fatigue, pain, and lack of concentration and comprehension. Carugati complained she experienced dizziness, memory loss, and cognitive disfunction. Carugati told the investigator that walking caused her to become exhausted, she was unable to sit straight up in a chair, and she normally stayed in bed. When the interviewer informed Carugati about the surveillance videos, Carugati confirmed she walked her dog and "asked if this was going to be a problem for her." *Id.* at ¶ 39.

Dr. George Kazda, Hartford's Associate Medical Director, reviewed Carugati's medical records, the June 20, 2000 interview, and the surveillance video. He spoke with Dr. Papernik about Carugati's condition. In an October 30, 2000 report, Dr. Kazda opined Carugati "has repeatedly understated her own capacity and thwarted attempts at any meaningful evaluations." *Id.* at ¶ 41. Dr. Kazda concluded the record did not contain evidence of significant physical abnormality and there was "no clear substantiation in the record of either chronic fatigue syndrome or fibromyalgia." *Id.* at ¶ 42. Dr. Kazda stated "[l]ong term secondary gain appears to be a major motivating factor." *Id.* at ¶ 45. Further, Dr. Kazda found the video surveillance in "marked contrast to Mrs. Carugati's own statement and statements to her physician." *Id.* at ¶ 46. Dr. Kazda did not examine or conduct any tests on Carugati.

On November 1, 2000, Hartford informed Carugati her benefits were terminated and she could appeal. Carugati appealed Hartford's decision and submitted additional evidence. Carugati provided a letter from Dr. Papernik; he attested to Carugati's condition and stated "she is medically unable to work in her present state of health and she is totally disabled." Pl. 56.1 Facts at ¶ 25. Carugati submitted Dr. Papernik's office notes and other assessments of functional capacity, records from the Social Security Administration, and a December 11, 2000 letter from the Social Security Administration stating that Carugati had a continuing disability. Carugati submitted two medical reports by Dr. Yatin Shah and Dr. William Hilger. Dr. Shah reported Carugati's daily activities could only be performed with difficulty. Dr. Hilger noted Carugati experienced a significant decline in her cognitive ability. Dr. Kazda reviewed Dr. Shah and Dr. Hilger's reports. In an April 26, 2001 report, Dr. Kazda concluded that Dr. Shah and Dr. Hilger reached different diagnoses. Dr. Kazda based his conclusion on Dr. Shah's diagnosis that Carugati's mental status was intact whereas Dr.

Hilger found Carugati suffered from memory loss. On June 14, 2001, Hartford reaffirmed its denial of disability benefits.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is proper when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *King v. National Human Res. Comm.*, 218 F.3d 719, 723 (7th Cir. 2000). Once a moving party has met its burden, the non-movant must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the nonmoving party. *Bay v. Cassens Transp., Co.*, 212 F.3d 969, 972 (7th Cir. 2000). A genuine issue of material fact exists when the evidence is sufficient to support a reasonable jury verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). In deciding cross-motions for summary judgment, the court construes all inferences in favor of the party opposing the motion under consideration. *Wilson v. Chrysler Corp.*, 172 F.3d 500, 511 (7th Cir. 1999).

### II. ERISA Standard of Review

At the outset, the parties dispute the proper standard of review. A denial of benefits challenged under § 1132(a)(1)(B) is reviewed *de novo* unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When a plan gives the administrator discretionary authority,

the appropriate standard of review is the arbitrary and capricious standard. *Mers v. Marriott Int'l Group*, 144 F.3d 1014, 1019 (7th Cir. 1997). Under the arbitrary and capricious standard, "[i]f the administrator makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts, then the administrator's decision is final." *Cvelbar v. CBI Illinois Inc.*, 106 F.3d 1368, 1379 (7th Cir. 1997).

The Hartford plan expressly provides the plan has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." Def. 56.1 Facts at ¶ 4; *Carr v. The Gates Health Care Plan*, 195 F.2d 292, 295 (7th Cir. 1999) (an express grant of discretion requires an application of the arbitrary and capricious standard). Although Carugati acknowledges the Hartford plan's express grant of discretion, she claims the absence of comparable language in the summary plan description requires the court to employ *de novo* review. Carugati's assertion is without merit. Where a summary description is silent on an issue, the plan controls because the two documents are not in direct conflict. *Mers v. Marriot Int'l Group Plan*, 144 F.3d 1014, 1023 (7th Cir. 1998). Carugati points to *Health Cost Controls of Illinois, Inc. v. Washington*, 187 F.3d 703 (7th Cir. 1999), and claims she relied on the absence of a discretion clause in the summary plan to her detriment. In *Health Cost*, the court recognized a summary plan may control when there is a conflict between the two plans and the participant relies on the summary plan to her detriment. *Health Cost* is inapposite because there is no conflict between the summary plan and the Hartford plan. The summary plan is silent on Hartford's discretion to award or deny benefits. Carugati also fails to explain the circumstances in which she relied on the absence of a discretion clause in the summary description to her detriment. Finally, Carugati contends Hartford's inherent conflict as payor and adjudicator of claims requires *de novo*

6

review. In *Mers*, the Seventh Circuit expressly rejected the inherent conflict theory and required the participant to provide "specific evidence of actual bias that there is a significant conflict" before finding *de novo* review the applicable standard. *Mers*, 144 F.3d at 1020. Carugati fails to advance specific evidence of an actual conflict. *Id.* Because the Hartford plan explicitly provides absolute discretion to the plan to determine eligibility, the proper standard of review is the arbitrary and capricious standard.

## III.     Termination of Disability Benefits

The material facts are not in dispute. The court must determine whether the plan's termination of Carugati's disability benefits was arbitrary and capricious as a matter of law. "Under the arbitrary and capricious standard, it is not [the court's] function to decide whether [it] would reach the same conclusion as the Plan or even rely on the same authority." *Mers*, 144 F.3d at 1021. A denial of benefits will not be set aside if it was based on a "reasonable interpretation of the plan documents." *Id.*; *see also Loyola Univ. v. Humana Ins. Co.*, 996 F.2d 895, 898 (7th Cir. 1993). Put another way, the court does not determine whether the administrator's decision is correct or whether the court would have answered the question differently. *Ross v. Indiana State Teacher's Assn.*, 159 F.3d 1001, 1009 (7th Cir. 1998). Under this deferential standard, the plan's decision to deny benefits is reviewed to determine whether it was "downright unreasonable." *Brehmer v. Inland Steel Indus. Pension Plan*, 114 F.3d 656, 660 (7th Cir. 1997)

The plan grounds its denial of disability benefits on Dr. Kazda's review of Carugati's medical file and the video surveillance tape. The plan asserts the denial of benefits was not arbitrary and capricious because Dr. Kazda determined from various medical reports that Carugati was exaggerating the severity of her condition. Further, Dr. Kazda opined the video surveillance tape

7

showing Carugati walking her dog for several minutes a day and climbing a small step ladder was evidence that she was misrepresenting her symptoms of chronic fatigue syndrome and fibromyalgia. Def. 56.1 Facts, Ex. 19. On that basis, the plan concluded Carugati was not disabled.

Although the arbitrary and capricious standard grants significant deference to the plan's determination of eligibility, the court's review is not a "rubber stamp." *Swaback v. American Info. Tech. Corp.*, 103 F.3d 535, 540 (7th Cir. 1996). "If fiduciaries or administrators of an ERISA plan controvert the plan meaning of a plan, their actions are arbitrary and capricious." *Id.* The plain language of the Hartford plan defines total disability as the inability to perform the material and substantial duties of the participant's occupation or any occupation that she could become qualified by training, education, or experience. Def. 56.1 Facts at ¶ 8. Through its own terms, the Hartford plan grounds its definition of disability on a participant's ability to function in employment. However, the plan's determination on Carugati's benefits eligibility fails to discuss Carugati's potential for employment, or whether Carugati could become qualified for employment through training or education.

In *Quinn v. Blue Cross & Blue Shield Assn.*, 161 F.3d 472 (7th Cir. 1998), the court held the plan's denial of benefits was arbitrary and capricious because it failed to determine whether the plan participant had the necessary skills to obtain a job. The plan defined a disabled person as an individual that was "prevented, by reason of mental or physical disability, from engaging in any occupation comparable to that in which he was engaged for the Employer, at the time his disability occurred." *Quinn*, 161 F.3d at 474. Although the plan concluded Quinn was able to perform "thousands of low skills jobs" in the economy, the court held the plan failed to discover "what Quinn's job duties entailed, what her exertional requirements were, any training and experience she

8

possessed, or any transferable skills she may have obtained." *Id.* at 476.

*Quinn* is instructive. The benefits plan in *Quinn* based its definition of disability on the ability of a plan participant to engage in employment. The court concluded the plan administrator's determination on eligibility was arbitrary and capricious because it failed to identify the skills necessary for Quinn to obtain comparable employment. *Quinn*, 161 F.3d at 476. In contrast, the plan's analysis on Carugati's claim completely fails to address Carugati's ability to perform any job in the national economy and the skills necessary to perform that job. Similar to *Quinn*, the Hartford plan bases its definition of disability on the ability of a participant to engage in employment. Dr. Kazda's report does not address Carugati's ability to engage in employment. Def. 56.1 Facts, Ex. 19. The plan does not submit vocational evidence that Carugati could find employment with her physical limitations or could be qualified for employment through training or education. Nor does the plan address Carugati's employment capability in its letter to Carugati terminating her benefits. *Id.*, Ex. 6.

In *Poulous v. Motorola Long term Disability Plan*, 93 F.Supp.2d 926, 930 (N.D. Ill. 2000), the court held a plan administrator's termination of benefits was arbitrary and capricious where the plan failed to take into account the participant's age, work experience, and skills in determining whether the participant was disabled. The plaintiff was 59 years old, she was unemployed for 13 years, and she was previously an unskilled worker. The court held the plan's restriction of its analysis to physical limitations without a "holistic inquiry demanded by its own Plan language, which would have required taking into consideration her age, skills, job history, and other relevant factors," was unreasonable. *Poulous*, 93 F.Supp.2d at 933. Notably, the plan defined disability as the inability "to perform all of the normal duties of any occupation or employment for wage or profit

9

for which [she] is reasonable qualified by education, training, or experience." *Id.* at 929; *see Glenn v. Secretary of Health and Human Serv.*, 814 F.2d 387, 389 (7th Cir. 1987) ("disability is a function in part of employment opportunities, and employability in turn is a function not only of one's physical capacity but of education, age, and other factors.")

The Hartford plan's definition of disability is similar to the definition in *Poulous*. Not only did the plan fail to analyze Carugati's physical limitations that could prevent employment, it neglected to consider Carugati's age, work history, and skills. Carugati is a 56 year old woman who has been unemployed for nine years. Prior to receiving disability benefits, Carugati was employed as an office clerk and receptionist. "By not even performing the slightest inquiry into this matter, [the plan] made [its] decision arbitrarily and capriciously." *Quinn*, 161 F.3d at 476; *cf. Rodriguez v. UNUM Life Ins. Co.*, 82 F.Supp.2d 828, 831 (N.D. Ill. 1999)(affirming denial of benefits where the plan took into consideration participant's future employment opportunities including age, education, and work history).

In addition to the plan's failure to assess Carugati's ability to function and engage in employment, the plan failed to sufficiently analyze the record evidence. In *Ladd v. ITT Corp.*, 148 F.3d 753 (7th Cir. 1998), the court found a plan's denial of disability benefits arbitrary and capricious where there was no evidence the participant was capable of employment, the Social Security Administration found the participant disabled, and the plan's physician failed to provide reasons for disagreeing with the participant's physicians and the Administrative Law Judge. Notably, the benefits plan defined total disability as the inability "to engage in any and every duty pertaining to any occupation or employment for wage or profit for which you are qualified or become reasonably qualified by training, education or experience. " *Ladd*, 148 F.3d at 754.

10

The plan primarily relies on Dr. Kazda's October 2000 two-page report to justify its denial of benefits. Def. 56.1 Facts, Ex. 19. Dr. Kazda's report consists of selective quotes from various medical records. *See Govindarajan v. FMC Corp.*, 932 F.2d 634 (7th Cir. 1991) (selective review of medical evidence to justify denial of benefits is arbitrary and capricious). Dr. Kazda reported Dr. Patel stated in a 1992 evaluation that his examination was not consistent with the severity of Carugati's complaints. Dr. Kazda stated a 1994 functional capacity evaluation was inconclusive because the report stated Carugati exerted less than maximal effort. *Id.*, Ex. 9. Dr. Kazda asserted a 1995 examination by Dr. Kamer concluded that Carugati had settled into a "pattern of invalidism." Def. 56.1 Facts, Ex. 11. From those statements and the video surveillance, Dr. Kazda concluded Carugati was not disabled. However, in 1992, Dr. Patel also concluded Carugati could work only if her psychiatric component was evaluated, and he believed Carugati's limitations were more psychiatric than physical. Def. 56.1 Facts, Ex. 8. The 1994 functional capacity report stated Carugati was unable to return to work at that time. *Id.* Although the 1995 report expressed concern with Carugati's lack of cooperation with the examination, Dr. Kamer concluded Carugati's recovery would be facilitated with a rehabilitation program, and Carugati should undergo periodic reevaluations of her physical capacity to return to work. *Id.* Significantly, none of those medical reports opined on Carugati's diagnosis of chronic fatigue syndrome or fibromyalgia.

In *Gawrysh v. CNA Ins. Co.*, 8 F.Supp.2d 791, 794 (N.D. Ill. 1998), the plan determined a participant did not suffer from chronic fatigue syndrome without hiring outside experts or its own doctors to examine the participant. Because of the difficulty in diagnosing chronic fatigue syndrome, the court determined the plan's failure to engage a physician to examine the participant before terminating benefits was arbitrary and capricious. *Gawrysh*, 8 F.Supp.2d at 796. Dr. Kazda's

11

conclusions on Carugati's condition is unclear. Indeed, Dr. Kazda's medical report suggests Carugati never suffered from chronic fatigue syndrome or fibromyalgia. Dr. Kazda's only support for that conclusion is a one-line comment that there "is no clear substantiation in the record of either chronic fatigue syndrome or fibromyalgia." Def. 56.1 Facts at ¶ 42, Ex. 19. Dr. Kazda arrived at this conclusion without conducting any physical examinations or medical tests on Carugati. *See Poulous*, 93 F.Supp.2d at 930 (non-examining physician's opinion is given less weight that reports of examining physicians). Dr. Kazda's report fails to discuss the record evidence that forms the basis for that conclusion. *Cf. Hackett v. Xerox Corp.*, 177 F.Supp.2d 803, 816 (N.D. Ill. 2001) (affirming denial of benefits after two independent psychiatrists concluded with supportive facts that participant was capable of working); *Cinova v. Long Term Disability Plan for BGE Ltd.*, No. 98 C 7266, 1998 WL 1144836, at *4 (N.D. Ill. Dec. 9, 1999) (affirming denial of benefits where the plan's doctor identified medical evidence that demonstrated the plaintiff did not suffer from fibromyalgia). Dr. Kazda and the plan's conclusion is inconsistent with its continuous payment of disability benefits to Carugati for nine years. Dr. Kazda's opinion of Carugati's condition in October 2000 are based on medical reports that are over five years old. Further, the plan made its determination on the opinion of one non-treating, non-examining physician, who is the plan's associate medical director. *Cf. Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 377 (7th Cir. 1994) (terminating benefits after review by an independent medical consulting agency, including "a board-certified internist and a roundtable of physicians").

In contrast, Dr. Papernik, Carugati's treating physician, diagnosed her with chronic fatigue syndrome and fibromyalgia from 1991 to 2000. Thus, the plan's reliance on *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996) is inapposite because *Yeager* affirmed

12

denial of benefits where the record was devoid of evidence that the participant suffered from fibromyalgia. In his report, Dr. Kazda summarily dismissed Dr. Papernik's diagnosis by stating his examination showed no significant abnormalities and was based on Carugati's subjective statements. *See Ladd*, 148 F.3d at 755 (criticizing the plan physician's perfunctory report and review of the participant's disability). However, Dr. Papernik was Carugati's treating physician for nine years and concluded in numerous evaluations that she suffered from fibromyalgia. In November 1993, Dr. Jose Gonzalez also diagnosed Carugati with chronic fatigue syndrome. At the time benefits were terminated, Carugati was prescribed medication (Valtaren, Welbutrin, and Klonopin) for chronic fatigue syndrome and fibromylagia. Def. 56.1 Facts. Ex. 26. A plan administrator must "offer a reasoned explanation, based on the evidence, for a particular outcome." *Hess v. Hartford Life & Acc. Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001). After the plan's initial denial of benefits, Carugati appealed the plan's decision and submitted medical reports from Dr. Yatin Shah and Dr. William Hilger. Dr. Kazda dismissed the two physician's report because the physicians purportedly reached inconsistent conclusions – Dr. Shah reported Carugati's memory was intact for recent and remote events while Dr. Hilger stated Carugati "showed poor memory especially for recent information." Def. 56.1 Facts, Ex. 28. On that basis, Dr. Kazda reaffirmed his conclusion that Carugati was not disabled. Again, the plan and Dr. Kazda failed to evaluate Carugati's ability to engage in employment, which constitutes the plan's definition of disability. Moreover, Dr. Kazda did not address Dr. Hilger's opinion that Carugati experienced a significant decline in cognitive ability, general knowledge, calculational ability and abstract reasoning. *Id.*

The plan's second basis for denying benefits – the video surveillance tape – only demonstrates Carugati can walk her dog for several minutes during the day and climb a small step

ladder. The video surveillance does not shed light on Carugati's ability to function at a full-time job. Under the Hartford plan, total disability is not equated with a plan participant's inability to walk, care for oneself, or perform routine daily functions but a participant's inability to engage in employment. Further, Dr. Kazda's conclusion that the video surveillance is in "marked contrast" with Carugati's statements about her condition is inaccurate. At the June 2000 interview with the plan's investigator, Carugati stated she had difficulty walking, experienced dizziness, and had problems balancing. Pl. 56.1 Facts at ¶ 21. Carugati's ability to walk her dog several minutes a day and climb a few rungs of a small step ladder once does not automatically render a conclusion that she was lying or misrepresenting her condition. *See Clausen v. Standard Ins. Co.*, 961 F. Supp. 1446, 1457 (D. Colo. 1997) (determining that video surveillance where plan participant walked her dog for two miles does not suggest participant was capable of that activity on a sustained basis). Indeed, the video surveillance documents only thirty-four minutes of outdoor activity over the course of three days, and one day where Carugati did not leave her home. The plan also relies on Dr. Kazda's speculative conclusion that "[l]ong term secondary gain appears to be a major motivating factor in this case." Def. 56.1 Facts at ¶ 45. Dr. Kazda formed that conclusion without examining or interviewing Carugati.

Significantly, the plan's determination on Carugati's condition comes after the plan paid benefits to Carugati for nine years. In *Regula v. Delta Family-Care Disability Survivorship*, 266 F.3d 1130, 1146 (9th Cir. 2001), the court held the plan arbitrarily and capriciously terminated benefits where the plan awarded benefits for eight years, there was no evidence of a significant change in the participant's condition, and the plan's doctors failed to explain their reasons for disagreeing with the treating physicians' opinion. *Regula* is analogous. From 1991 to 2000, the

14

Hartford plan conducted four evaluations of Carugati's condition but it continued benefits after each evaluation. At the time benefits were terminated, the record was devoid of new medical evidence indicating a significant change in Carugati's condition. *See McOsker v. Paul Revere Life Ins. Co.*, 279 F.2d 586, 589 (8th Cir. 2002) ("unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments"). Further, Carugati received social security disability benefits for nine years, and continued to receive those benefits at the time the plan terminated long-term disability benefits. *See Ladd*, 148 F.3d at 756 (noting the plan administrator failed to address participant's receipt of social security benefits).

ERISA was enacted to "promote the interests of employees and their beneficiaries in employee benefits plans," *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983), and "to protect contractually defined benefits." *Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 148 (1985). Even under an arbitrary and capricious standard of review, ERISA's purpose in protecting a plan participant's rights must be safeguarded. "Deferential review is not no review" and "deference need not be abject." *Hess*, 274 F.3d at 461. Giving a plan discretion and deference to determine a participant's eligibility does not sanction a minimalist review and cursory analysis. The Hartford plan chose to define disability within the context of a participant's ability to engage in employment. Thus, the plan's determination on disability benefits must comport with the plain language of the plan's provisions. *Hess*, 274 F.3d at 461 (disregard of "the plain language or structure of the plan or simple common sense will require the court to pronounce an administrator's determination arbitrary and capricious.") The plan failed to analyze Carugati's ability to engage in employment in accordance with the Hartford plan's definition of total disability.

Moreover, the arbitrary and capricious standard requires "a rational connection between the issue to be decided, the evidence in the case, the text under consideration, and the conclusion reached." *Exbom v. Central States S.E. & S.W. Areas Health and Welfare Fund*, 900 F.2d 1138, 1143 (7th Cir. 1990) (internal quotations omitted). The plan concluded Carugati was not disabled based on Dr. Kazda's brief report and an immaterial video surveillance tape. The plan chose not to conduct an independent medical examination, and it failed to sufficiently analyze the record evidence. *See Stamm v. Provident Life and Accident Ins. Co.*, No. 96 C 3311, 1998 WL 596700, at *12 (N.D. Ill. Sept. 2, 1998) (where plan had a "vague suspicion" that plaintiff was not disabled, termination of benefits without conducting an independent medical examination bolstered an arbitrary and capricious finding). Thus, the plan failed to make a rational connection between the evidence in the case and its conclusion to terminate benefits. Accordingly, as a matter of law, the plan's termination of Carugati's benefits was arbitrary and capricious.

## IV. Remedy for ERISA Violation, Prejudgment Interest, and Attorney's Fees

In the alternative, the plan argues if the termination of Carugati's benefits is found arbitrary and capricious, the appropriate remedy is a remand to the plan administrator for additional findings. In *Quinn*, the Seventh Circuit addressed the remedy for an ERISA violation by the plan administrator. The court noted that "in some cases, retroactive reinstatement of benefits is the proper remedy." *Quinn*, 161 F.3d at 477. The court recognized reinstatement of benefits was proper where the claimant was receiving disability benefits and "but for their employer's arbitrary and capricious conduct, would have continued to receive the benefits". *Id.* However, the court stated that remand to the plan administrator was the appropriate remedy where additional findings of fact are required or where the plan fails to provide an adequate reasoning, "unless it is so clear cut that it would be

16

unreasonable for the plan administrator to deny the application for benefits on any ground." *Id.* at 477. In *Quinn*, the Seventh Circuit reversed the district court's grant of retroactive benefits and remanded the case to the plan administrator for a proper finding on the plaintiff's ability to obtain a comparable occupation. *Id.* at 478. The court noted the district court's award of retroactive benefits constituted a decision that the plaintiff was disabled. *Id.*; *see also Hess*, 274 F.3d at 464.

In determining the plan's termination of benefits was arbitrary and capricious, the court does not decide Carugati is disabled under the plan's definition of total disability. Instead, the plan's failure to assess Carugati's vocational capabilities combined with its failure to adequately assess Carugati's condition and the record evidence constitute an arbitrary and capricious decision to terminate benefits. Awarding Carugati retroactive benefits would be tantamount to a finding that Carugati was disabled during the period following termination of benefits. Further, Carugati's evidence is not "so clear cut" that it would be unreasonable on any grounds to deny benefits. *Id.* *Quinn* requires this court to remand the matter to the plan administrator because the plan's decision was "arbitrary and capricious, but not necessarily wrong." *Quinn*, 161 F.3d at 478. Consequently, remand of the case to the plan administrator is warranted. *See also Quinn v. The Non-Contributory National Long Term Disability Program*, 113 F.Supp.2d 1216 (N.D. Ill. 2000). Carugati's request for prejudgment interest is premature.

Finally, Carugati requests attorney's fees. ERISA grants the court discretion to award reasonable attorney's fees to either party, and there is a modest presumption the prevailing party in an ERISA case is entitled to fees. 29 U.S.C. § 1132(g)(1); *Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 592 (7th Cir. 2000). The Seventh Circuit has designed two tests for the award of attorney's fees in ERISA cases. *Quinn*, 161 F.3d at 478. The first test assesses the following five

factors: "1) the degree of the offending parties' culpability or bad faith; 2) the degree of the ability of the offending parties to satisfy personally an award of attorney's fees; 3) whether or not an award of attorney's fees against the offending parties would deter other persons acting under similar circumstances; 4) the amount of benefit conferred on members of the pension plan as a whole; and 5) the relative merits of the parties' positions." *Id.* The second test considers whether the losing party's position was "substantially justified." *Bittner v. Sadoff & Rudoy Industries,* 728 F.2d 820, 830 (7th Cir. 1984). The Seventh Circuit recently reformulated the two tests into one question: "was the losing party's position substantially justified and taken in good faith, or was that party simply out to harass its opponent?" *Hess,* 274 F.3d at 364; *Quinn,* 161 F.3d at 479.

In *Quinn,* the court denied the plaintiff attorney's fees because it remanded the action to the plan administrator for additional findings on the plaintiff's vocational abilities. As a result, the court held the plaintiff was not a "prevailing party in the truest sense of the term" and was entitled to taxable costs but not attorney's fees. *Id.* The court noted the plaintiff could eventually recover attorney's fees if she ultimately prevailed on her claim. *Id.* Because this court remands the matter to the plan administrator, Carugati is only "a prevailing party in some sense of the term" and she is not entitled to attorney's fees at this juncture. *Id.* Carugati fails to present evidence the plan's decision was in bad faith or was taken to harass Carugati by denying her disability benefits.

## CONCLUSION

Carugati's motion for summary judgment is granted. The plan's motion for summary judgment is denied. The matter is remanded to the plan administrator to make findings consistent with this memorandum opinion and order.

March 20, 2002

ENTER:

*Suzanne B. Conlon*
Suzanne B. Conlon
United States District Judge